FILED

2011 DEC -2 PM 4:04

CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
SANTA ANA

BY_____

CLIFFORD H. PEARSON (Bar No. 108523)
  cpearson@pswplaw.com
DANIEL L. WARSHAW (Bar No. 185365)
  dwarshaw@pswplaw.com
BOBBY POUYA (Bar No. 245527)
  bpouya@pswplaw.com
**PEARSON, SIMON, WARSHAW & PENNY, LLP**
15165 Ventura Boulevard, Suite 400
Sherman Oaks, California 91403
Telephone: (818) 788-8300
Facsimile: (818) 788-8104

SCOTT J. FERRELL (Bar No. 202091)
  sferrell@trialnewport.com
JAMES B. HARDIN (Bar No. 205071)
  jhardin@trialnewport.com
STEVEN R. TELLES (Bar No. 246514)
  stelles@trialnewport.com
RYAN M. FERRELL (Bar No. 258037)
  rferrell@trialnewport.com
**NEWPORT TRIAL GROUP**
895 Dove Street, Suite 425
Newport Beach, California 92660
Telephone: (949) 706-6464
Facsimile: (949) 706-6469

Attorneys for Plaintiff and the Class

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MONICA FERNANDEZ; ELEANOR LANIGAN; MICHAEL MARTINEZ; GLENNA O'DELL; and GEMIS RANGEL, individually, and on behalf of all others similarly situated, <br><br> Plaintiffs, <br><br> vs. <br><br> BOIRON, INC.; and BOIRON USA, INC.; Inclusive, <br><br> Defendants. | Case No.: **SACV11-01867 CJC (MLGx)** <br><br> **CLASS ACTION COMPLAINT** <br><br> **JURY TRIAL DEMANDED** |

- 1 -
CLASS ACTION COMPLAINT

FILED
2011 DEC -2 PM 4: 04
CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
SANTA ANA
BY_____

CLIFFORD H. PEARSON (Bar No. 108523)
   cpearson@pswplaw.com
DANIEL L. WARSHAW (Bar No. 185365)
   dwarshaw@pswplaw.com
BOBBY POUYA (Bar No. 245527)
   bpouya@pswplaw.com
**PEARSON, SIMON, WARSHAW & PENNY, LLP**
15165 Ventura Boulevard, Suite 400
Sherman Oaks, California 91403
Telephone: (818) 788-8300
Facsimile: (818) 788-8104

SCOTT J. FERRELL (Bar No. 202091)
   sferrell@trialnewport.com
JAMES B. HARDIN (Bar No. 205071)
   jhardin@trialnewport.com
STEVEN R. TELLES (Bar No. 246514)
   stelles@trialnewport.com
RYAN M. FERRELL (Bar No. 258037)
   rferrell@trialnewport.com
**NEWPORT TRIAL GROUP**
895 Dove Street, Suite 425
Newport Beach, California 92660
Telephone: (949) 706-6464
Facsimile: (949) 706-6469

Attorneys for Plaintiff and the Class

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MONICA FERNANDEZ; ELEANOR LANIGAN; MICHAEL MARTINEZ; GLENNA O'DELL; and GEMIS RANGEL, individually, and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>BOIRON, INC.; and BOIRON USA, INC.; Inclusive,<br><br>Defendants. | Case No.:  **SACV11-01867 CJC (MLGx)**<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

- 1 -
CLASS ACTION COMPLAINT

Plaintiffs, MONICA FERNANDEZ, ELEANOR LANIGAN, MICHAEL MARTINEZ, GLENNA O'DELL, and GEMIS RANGEL (collectively, "Plaintiffs"), individually and on behalf of all others similarly situated, allege on information and belief:

## I. INTRODUCTION

1. Defendants BOIRON, INC. and BOIRON USA, INC. (collectively, "Defendants") manufacture, advertise, sell, and distribute over 100 "homeopathic" products – each purported "medicine" is advertised as curing, treating, and/or relieving major health issues. Defendants' claims are welcomed by hundreds of thousands afflicted by the particular ailment that each product is advertised to treat; unfortunately, hundreds of thousands of consumers have purchased Defendants products because of Defendants' advertising claims and packaging and not received the promised benefits.

2. As just a few examples, ColdCalm is a sugar pill that Defendants advertise has the ability to cure the common cold and provide relief of cold-like symptoms. Arnicare Arthritis is a combination salt and sugar pill that Defendants advertise has the ability to relieve arthritis, specifically: trauma, muscle soreness, wrist pain, joint pain, neuralgic pain, rheumatic pain, and pain worsened by heat, rest, or humidity. Chestal is sugar and salt water that Defendants advertise has the ability to cure dry cough, productive cough, chest congestion, and other cough related health issues. Quietude is a combination salt and sugar pill that Defendants advertise as a sleeping pill and that Quietude has the ability to provide relief from insomnia and other sleep related health issues.

3. As further explained in Plaintiff's Complaint, Defendants' advertising is consistently false, misleading, and deceptive. While only 4 of Defendants' products are discussed in depth in this Complaint, each of Defendants' products suffers from the same false, misleading, and deceptive advertising in the exact same manner.

4. Defendants' misrepresentations regarding the efficacy of Arnicare

Arthritis, Chestal, ColdCalm, and Quietude (collectively, "Products") were designed to, and did, lead Plaintiffs and others similarly situated (collectively, the "Class") to believe that the Products would cure their ailments and relieve the symptoms that accompany their ailments. Plaintiffs and members of the Class relied on Defendants' misrepresentations and would not have paid as much, if at all, for the Products but for the misrepresentations of Defendants.

5. Accordingly, Plaintiffs bring this lawsuit to enjoin the ongoing deception of millions of consumers by Defendants, and to recover the money taken by this unlawful practice.

## II. THE PARTIES

### A. Plaintiff.

6. Plaintiff Monica Fernandez ("Plaintiff") is a resident of San Bernardino County, California who purchased one of Defendants' homeopathic drugs, Chestal, in San Bernardino, California. Plaintiff relied on Defendants' representations regarding the ingredients and benefits of Chestal, as detailed herein, and but for those representations, Plaintiff would not have purchased or paid as much for Chestal.

7. Plaintiff Eleanor Lanigan ("Plaintiff") is a resident of San Bernardino County, California who purchased one of Defendants' homeopathic drugs, ColdCalm, in Apple Valley, California. Plaintiff relied on Defendants' representations regarding the ingredients and benefits of ColdCalm, as detailed herein, and but for those representations, Plaintiff would not have purchased or paid as much for ColdCalm.

8. Plaintiff Michael Martinez ("Plaintiff") is a resident of San Bernardino County, California who purchased one of Defendants' homeopathic drugs, Arnicare Arthritis, in Victorville, California. Plaintiff relied on Defendants' representations regarding the ingredients and benefits of Arnicare Arthritis, as detailed herein, and but for those representations, Plaintiff would not have purchased or paid as much for Arnicare Arthritis.

9. Plaintiff Glenna O'Dell ("Plaintiff") is a resident of Los Angeles County, California who purchased one of Defendants' homeopathic drugs, ColdCalm, in California. Plaintiff relied on Defendants' representations regarding the ingredients and benefits of ColdCalm, as detailed herein, and but for those representations, Plaintiff would not have purchased or paid as much for ColdCalm.

10. Plaintiff Gemis Rangel ("Plaintiff") is a resident of San Bernardino County, California who purchased one of Defendants' homeopathic drugs, Quietude, in California. Plaintiff relied on Defendants' representations regarding the ingredients and benefits of Quietude, as detailed herein, and but for those representations, Plaintiff would not have purchased or paid as much for Quietude.

**B.   Boiron, Inc. and Boiron USA, Inc. Defendants.**

11. Plaintiffs are informed and believe, and upon such information and belief allege, that Defendants Boiron, Inc. and Boiron USA, Inc. ("Defendants") are Pennsylvania corporations that produce, market, and sell homeopathic drugs as described herein, and do business in California.

### III.   JURISDICTION AND VENUE

12. This Court has jurisdiction over the subject matter presented by this Complaint because it is a class action arising under the Class Action Fairness Act ("CAFA"), Pub. L. No. 109-2, 119 Stat. 4 (2005), which explicitly provides for the original jurisdiction of the Federal Courts over any class action in which any member of the Plaintiff Class is a citizen of a state different from any Defendant, and in which the matter in controversy exceeds in the aggregate the sum of $5,000,0000, exclusive of interest and costs.

13. Plaintiffs allege that the total damages of the individual members of the Plaintiff Class in this action are in excess of $5,000,000 in the aggregate, exclusive of interest and costs, as required by 28 U.S.C. § 1332(d)(2), (5).

14. As set forth above, Plaintiffs are citizens of California and Defendants are citizens of Pennsylvania. Therefore, diversity of citizenship exists under CAFA, as required by 28 U.S.C. § 1332(d)(2)(A).

15. The declarations of venue required by California Civil Code § 1780(d) are attached hereto as Exhibits 1-5. Venue is proper in this Court because Plaintiffs purchased the product in this Judicial District and because Defendants have received substantial compensation from sales in this Judicial District. Specifically, Defendants knowingly engage in activities directed at consumers in this Judicial District, and Defendants obtain substantial benefits from their scheme perpetrated in this Judicial District.

## IV. FACTUAL ALLEGATIONS

### A. Coldcalm

16. The common cold, the most infectious disease known to infect humans, is caused by a number of different viruses[1]. There is currently **no known cure** for the cold **nor is there any treatment** to shorten the duration of the viruses that cause the common cold.

17. Cold symptoms include: sneezing, nasal discharge, sore throat, sinus pain, and headaches. The United States National Library of Medicine estimates that the average person will be afflicted with the common cold multiple times each year.

18. Defendants' product ColdCalm purports to treat each of the aforementioned symptoms. ColdCalm relieves: "sneezing and runny nose", "nasal congestion", "sinus pain", "headaches", "nasal discharge", "sneezing attacks", and "sore throat".[2]

---

[1] The Center for Disease Control and Prevention reports over 200 viruses cause the common cold. http://www.cdc.gov/getsmart/antibiotic-use/uri/colds.html.

[2] http://www.boironusa.com/products/coldcalm.php (last accessed December 1, 2011).



19. Defendants list the ingredients of ColdCalm by their more exotic sounding Latin names: allium cepa, apis mellifica, belladonna, eupatorium perfoliatum, gelsemium sempervirens, kali bichromicum, nux vomica, phytolacca decandra, and pulsatilla. By listing the ingredients in this manner, Defendants are able to hide the fact that the alleged active ingredients of ColdCalm include: honey bee, deadly nightshade, strychnine tree, poke root, and onion.

20. Fortunately, since many of these ingredients are toxic, the ingredients are diluted 1 to 1,000,000 or 1 to 1,000,000,000,000. Succinctly stated, the ingredients are diluted to the point that they have no medicinal effect on the human body.

21. Defendants sell ColdCalm for approximately $10 per unit based on the preceding false, misleading, and deceptive advertising claims. As a result, Defendants have wrongfully taken millions of dollars from consumers.

22. Periodically, in 2009, Plaintiff Glenna O'Dell purchased ColdCalm. She did so after reading, believing, and relying upon Defendants' advertising, including the representations set forth above regarding the efficacy of ColdCalm in fighting the cold

and symptoms of the cold. Plaintiff Glenna O'Dell used ColdCalm as directed, but did not obtain the promised results—ColdCalm had no impact on Plaintiff's colds or any symptoms that accompany the cold.

23. In mid 2011, Plaintiff Eleanor Lanigan purchased ColdCalm. She did so after reading, believing, and relying upon Defendants' advertising, including the representations set forth above regarding the efficacy of ColdCalm in fighting the cold and symptoms of the cold. Plaintiff Eleanor Lanigan used ColdCalm as directed, but did not obtain the promised results—ColdCalm had no impact on Plaintiff's cold or any symptoms that accompany the cold.

24. Defendants' misrepresentations regarding the ingredients, efficacy, and benefits of ColdCalm were designed to, and did, induce reliance from reasonable consumers, including Plaintiffs Glenna O'Dell and Eleanor Lanigan and members of the Class.

25. As a direct and proximate result of Defendants' false and misleading representations, reasonable consumers—including Plaintiff Glenna O'Dell, Eleanor Lanigan and members of the Class—were led to believe that ColdCalm would relieve the cold or symptoms that accompany the cold. Based on these beliefs, Plaintiff Glenna O'Dell, Eleanor Lanigan and members of the Class purchased ColdCalm. But for the misrepresentations of Defendants, Plaintiffs and the members of the Class would not have purchased Defendants' products.

26. Plaintiff Glenna O'Dell, Eleanor Lanigan and members of the Class have suffered injury in fact and have lost money as a result of Defendants' misconduct. Plaintiff Glenna O'Dell, Eleanor Lanigan and members of the Class relied on Defendants' misrepresentations and would not have paid as much, if at all, for ColdCalm but for Defendants' misrepresentations on the labeling, packaging, and other advertising for ColdCalm. ColdCalm has no stated or implied purpose other than to combat the cold and symptoms of the cold. As such, its lack of efficacy renders the product completely and utterly worthless.

27. As a result of the false and misleading representations detailed above, Defendants were able to charge approximately $10.00 per unit for the worthless product ColdCalm, which is nothing more than a sugar pill. Defendants have reaped substantial profit from their misrepresentations and have been unjustly enriched by wrongfully taking millions of dollars from California consumers.

C. **Arnicare Arthritis**

28. Arthritis is the most common cause of disability in the United States, limiting the activities of nearly 21 million adults.[3] The term arthritis means joint inflammation and is used to describe more than 100 rheumatic diseases and conditions that affect joints, the tissues that surround joints, and many other conditions that affect joints.

29. The symptoms of arthritis are generally pain, stiffness, and inflammation involving joints; however, certain types of arthritis can also involve the immune system and internal body organs.

30. Defendants' product Arnicare Arthritis purports to treat: "trauma and muscle soreness", "pain in the wrists", "muscle and joint pain", "joint pain worsened by damp weather", "joint pain worsened by heat and slow motion", "neuralgic pain", "joint pain worsened at night", "rheumatic pains", and "joint pains worsened by rest and humidity".[4]

/ / /

/ / /

/ / /

---

[3] Center for Disease Control and Prevention. http://www.cdc.gov/arthritis/data_statistics.htm.
[4] http://www.boironusa.com/products/arnicare-arthritis.php (last accessed December 1, 2011).



31. Again, Defendants list the ingredients of Arnicare Arthritis by their more exotic sounding Latin names: arnica montana, benzoicum acidum, bryona alba, dulcamara, pulsatilla, chamomilla, kali iodatum, rhododendrum chrysanthum, and rhus toxicodendron. By listing the ingredients in this manner, Defendants are able to hide the fact that the alleged active ingredients of Arnicare Arthritis include: a class B noxious weed, alpine rose, and poison ivy.

32. Fortunately, since many of these ingredients are toxic, the ingredients are diluted 1 to 1,000,000, 1 to 1,000,000,000,000, or 1 to 1,000,000,000,000,000,000,000,000. Succinctly stated, the ingredients are diluted to the point that they have no medicinal effect on the human body.

33. Defendants sell Arnicare Arthritis for approximately $10 per unit based on the preceding false, misleading, and deceptive advertising claims. As a result, Defendants have wrongfully taken millions of dollars from consumers.

34. In 2011, Plaintiff Michael Martinez purchased Arnicare Arthritis. He did so after reading, believing, and relying upon Defendants' advertising, including the

representations set forth above regarding the efficacy of Arnicare Arthritis in fighting arthritis and symptoms of arthritis. Plaintiff Michael Martinez used Arnicare Arthritis as directed, but did not obtain the promised results—Arnicare Arthritis had no impact on Plaintiff's arthritis or any symptoms that accompany his arthritis.

35. Defendants' misrepresentations regarding the ingredients, efficacy, and benefits of Arnicare Arthritis were designed to, and did, induce reliance from reasonable consumers, including Plaintiff Michael Martinez and members of the Class.

36. As a direct and proximate result of Defendants' false and misleading representations, reasonable consumers—including Plaintiff Michael Martinez and members of the Class—were led to believe that Arnicare Arthritis would relieve their arthritis or symptoms that accompany their arthritis. Based on these beliefs, Plaintiff Michael Martinez and members of the Class purchased Arnicare Arthritis. But for the misrepresentations of Defendants, Plaintiffs and the members of the Class would not have purchased Defendants' products.

37. Plaintiff Michael Martinez and members of the Class have suffered injury in fact and have lost money as a result of Defendants' misconduct. Plaintiff Michael Martinez and members of the Class relied on Defendants' misrepresentations and would not have paid as much, if at all, for Arnicare Arthritis but for Defendants' misrepresentations on the labeling, packaging, and other advertising for Arnicare Arthritis. Arnicare Arthritis has no stated or implied purpose other than to combat arthritis and symptoms of arthritis. As such, its lack of efficacy renders the product completely and utterly worthless.

38. As a result of the false and misleading representations detailed above, Defendants were able to charge approximately $10.00 per unit for the worthless product Arnicare Arthritis, which is nothing more than a salt/sugar pill. Defendants have reaped substantial profit from their misrepresentations and have been unjustly enriched by wrongfully taking millions of dollars from California consumers.

### D. Chestal

39. Coughs come in two types, have many causes, and have many classifications. Coughs can be dry (no sputum) or productive (accompanied by sputum). Coughs can be acute (sudden onset), subacute (lasting 3-8 weeks), or chronic (longer than 8 weeks). Some causes of a cough include: irritants in the air, viruses, bacteria, disease, choking, nasal drip, tumors, heart failure, and medication. Coughs can be described as normal, hacking, barking, etc… In children the type of cough is more indicative of the underlying problem (if any).

40. Despite the many causes of coughs, Defendants market Chestal and Children's Chestal (not differentiated hereafter for reasons listed) as medicine to relieve both types of coughs (dry and wet), regardless of cause or classification. According to Defendants' ingredient lists of Chestal and Children's Chestal there is no difference between the two (same ingredients in the same concentrations). Defendants advertise that Chestal: "loosens thick mucus", "relieves dry and painful cough", "relieves cough associated with a tickling in the throat", "relieves barking cough worse at night", "relieves cough associated with nausea", "relieves wet cough associated with the day becoming dry at night", relieves dry cough triggered by cold air", "relieves dry, croupy and barking cough", and "relieves nighttime hacking cough."[5] [6]

///

///

///

---

[5] http://www.boironusa.com/products/chestal.php (last accessed December 1, 2011).
[6] http://www.boironusa.com/products/childrens-chestal.php (last accessed December 1, 2011).



41.     Again, Defendants list the ingredients of Chestal by their more exotic sounding Latin names: antimonium tartaricum, bryonia alba, coccus cacti, drosera rotundifolia, ipecacuanha, pusatilla, rumex crispus, spongia tosta, and stricta pulmonaria.  By listing the ingredients in this manner, Defendants are able to hide the fact that the alleged active ingredients of Chestal include: a parasitic insect, wind flower, lung moss, and sea sponge that has been roasted.

42.     Fortunately, since many of these ingredients are toxic, the ingredients are diluted from 1 to 1,000,000 or 1 to 1,000,000,000,000.  Succinctly stated, the ingredients are diluted to the point that they have no medicinal effect on the human body.

43. Defendants sell Chestal for approximately $5 to $10 per unit based on the preceding false, misleading, and deceptive advertising claims. As a result, Defendants have wrongfully taken millions of dollars from consumers.

44. In early 2011, Plaintiff Monica Fernandez purchased Chestal. She did so after reading, believing, and relying upon Defendants' advertising, including the representations set forth above regarding the efficacy of Chestal in fighting coughs and symptoms of a cough. Plaintiff Monica Fernandez used Chestal as directed, but did not obtain the promised results—Chestal had no impact on Plaintiff's cough or any symptoms that accompany the cough.

45. Defendants' misrepresentations regarding the ingredients, efficacy, and benefits of Chestal were designed to, and did, induce reliance from reasonable consumers, including Plaintiff Monica Fernandez and members of the Class.

46. As a direct and proximate result of Defendants' false and misleading representations, reasonable consumers—including Plaintiff Monica Ferenandez and members of the Class—were led to believe that Chestal would relieve coughs or symptoms that accompany coughs. Based on these beliefs, Plaintiff Monica Fernandez and members of the Class purchased Chestal. But for the misrepresentations of Defendants, Plaintiffs and the members of the Class would not have purchased Defendants' products.

47. Plaintiff Monica Fernandez and members of the Class have suffered injury in fact and have lost money as a result of Defendants' misconduct. Plaintiff Monica Fernandez and members of the Class relied on Defendants' misrepresentations and would not have paid as much, if at all, for Chestal but for Defendants' misrepresentations on the labeling, packaging, and other advertising for Chestal. Chestal has no stated or implied purpose other than to combat coughs and symptoms of coughs. As such, its lack of efficacy renders the product completely and utterly worthless.

48. As a result of the false and misleading representations detailed above,

Defendants were able to charge approximately $5.00 to $10.00 per unit for the worthless product Chestal, which is nothing more than salt/sugar water. Defendants have reaped substantial profit from their misrepresentations and have been unjustly enriched by wrongfully taking millions of dollars from California consumers.

### E. Quietude

49. Insomnia (sleeplessness) is a symptom and a disorder. The causes of insomnia are innumerable and range from mundane (e.g. stress) to fatal (e.g. cardiovascular disease). 40% of the population of the United States reports infrequent insomnia and 10% of the population of the United States experience chronic insomnia.[7]

50. Despite being a problem in and of itself, insomnia often exacerbates the underlying issue(s) by leaving the sufferer fatigued and with a lowered immune system.

51. Even though insomnia is unique to each person, Defendants offer a catchall remedy, Quietude.

52. Defendants advertise that Quietude relieves: "restless sleep associated with nervousness", "restless sleep [generally]", "sleeplessness associated with worries and exhaustion", and "sleeplessness with intermittent awakening."[8]

/ / /

/ / /

/ / /

---

[7] National Sleep Foundation
[8] http://www.boironusa.com/products/quietude.php (last accessed December 1, 2011).



53.     Again, Defendants list the ingredients of Quietude by their more exotic sounding Latin names: hyoscyamus niger, nux moschata, passiflora incarnate, and stramonium.  By listing the ingredients in this manner, Defendants are able to hide the fact that the alleged active ingredients of Quietude include: stinking nightshade, nutmeg, purple passionflower, and seeds of the jimson weed.

54.     Fortunately, since many of these ingredients are toxic, the ingredients are diluted 1 to 1,000, 1 to 1,000,000, or 1 to 100,000,000.  Succinctly stated, the ingredients are diluted to the point that they have no medicinal effect on the human body.

55.     Defendants sell Quietude for approximately $10 per unit based on the preceding false, misleading, and deceptive advertising claims.  As a result, Defendants have wrongfully taken millions of dollars from consumers.

56.     In 2011, Plaintiff Gemis Rangel purchased Quietude.  He did so after reading, believing, and relying upon Defendants' advertising, including the representations set forth above regarding the efficacy of Quietude in fighting sleeplessness and symptoms of sleeplessness.  Plaintiff Gemis Rangel used Quietude as directed, but did not obtain the promised results—Quietude had no impact on Plaintiff's

sleeplessness or any symptoms that accompany sleeplessness.

57. Defendants' misrepresentations regarding the ingredients, efficacy, and benefits of Quietude were designed to, and did, induce reliance from reasonable consumers, including Plaintiff Gemis Rangel and members of the Class.

58. As a direct and proximate result of Defendants' false and misleading representations, reasonable consumers—including Plaintiff Gemis Rangel and members of the Class—were led to believe that Quietude would relieve sleeplessness or symptoms that accompany sleeplessness. Based on these beliefs, Plaintiff Gemis Rangel and members of the Class purchased Quietude. But for the misrepresentations of Defendants, Plaintiffs and the members of the Class would not have purchased Defendants' products.

59. Plaintiff Gemis Rangel and members of the Class have suffered injury in fact and have lost money as a result of Defendants' misconduct. Plaintiff Gemis Rangel and members of the Class relied on Defendants' misrepresentations and would not have paid as much, if at all, for Quietude but for Defendants' misrepresentations on the labeling, packaging, and other advertising for Quietude. Quietude has no stated or implied purpose other than to combat sleeplessness and symptoms of sleeplessness. As such, its lack of efficacy renders the product completely and utterly worthless.

60. As a result of the false and misleading representations detailed above, Defendants were able to charge approximately $10.00 per unit for the worthless product Quietude, which is nothing more than a salt/sugar pill. Defendants have reaped substantial profit from their misrepresentations and have been unjustly enriched by wrongfully taking millions of dollars from California consumers.

F. **Homeopathy**

61. Each of the aforementioned products and all of Defendants' products belong to a class of drugs known as "homeopathic medicine" or "natural medicine".

This is prominently advertised, but not explained, on the packaging of Defendants' products.

62. While marketed as drugs effective in the treatment for any ailment or condition, homeopathic "drugs" are not held to the same rigorous standards as other drugs. Non-homeopathic over-the-counter ("OTC") drugs must seek approval by the U.S. Food and Drug Administration ("FDA") through a detailed drug application that must include: evidence of adequate and well-controlled investigations, including clinical trials, by experts qualified by scientific training and experience to evaluate the effectiveness of the drug involved, on the basis of which it could fairly and responsibly be concluded by such experts that the drug will have the effect it purports or is represented to have under the conditions of use prescribed, recommended, or suggested in the labeling or proposed labeling thereof. 21 U.S.C. § 355.

63. Unlike non-homeopathic OTC drugs, homeopathic OTC drugs, including Defendants' drugs at issue in this matter, are not evaluated at all by the FDA.

64. This can and has lead to serious confusion. In the instant matter, this confusion crosses the line into deception and fraud. Defendants are not only taking advantage of the public's desire for inexpensive natural medicine, but also deceiving the public into believing that Defendants' products are effective, regulated drugs that are held to the same standards as true medical drugs and non-homeopathic OTC drugs.

65. Homeopathic drugs are not classified as such by demonstrated effectiveness, but by "provings" conducted in the 1800's and early 1900's. These "provings" did not show effectiveness in curing ailments. In fact, the "provings" showed that the homeopathic substance caused symptoms similar to those of the ailment. These "provings" were based on the "law of similars"—a notion that symptoms of disease, ailment, or condition can be cured by extremely small amounts of substances that produce similar symptoms in healthy people when administered in large amounts.

///

66. After being subjected to "provings" (showing that the substance was suspected to cause the same symptoms as a specific ailment or condition), homeopathic solutions were then included in the Homeopathic Pharmacopeia of the United States ("HPUS"). The 1938 Federal Food, Drug, and Cosmetic Act ("FDCA") recognized as drugs all substances included in the HPUS. However, neither the FDA nor any law recognizes homeopathic drugs as effective to treat anything. Even the HPUS does not list its drugs as fit to treat specific symptoms, ailments, or conditions. The HPUS actually describes how the drugs are prepared for homeopathic use and leaves the decision for reason for use up to the practitioner (or manufacturer).

67. The FDA has stated, "[a] product's compliance with requirements of the HPUS … does *not* establish that it has been shown by appropriate means to be safe, effective, and *not* misbranded for its intended use." FDA Compliance Policy Guides § 400.400 (emphasis added).

G. **Homeopathic Effectiveness**

68. The effectiveness of homeopathy has been in dispute since its inception. There have been numerous "studies" that claim to prove the effectiveness of homeopathic remedies. However, when these studies are scrutinized, none has held up. For example, in 2005, the Government of Switzerland conducted 110 placebo-controlled homeopathy trials. The study found that any positive clinical effects of homeopathy are nothing more than placebo effects.

69. Health organizations such as the American Medical Association and the National Health Service have issued statements that there is no scientific evidence to support the use of homeopathic treatments in medicine. Even homeopathy's own supporters, such as the National Center for Complementary and Alternative Medicine, admit that "[t]here is [] no condition for which homeopathy has been proven to be an effective treatment."

///